### TIAB COMMUNICATIONS CORPORATION,
Plaintiff

v.

### KEYMARKET OF NEPA, INC. and Sinclair Communications Licensee of Wilkes–Barre, Inc., Defendants

No. 3:CV–97–0613.

United States District Court,
M.D. Pennsylvania.

May 20, 2003.

---

6. What we refer to as Count Five is labeled in the complaint as Count Six.

Kevin W. Walsh, Pepper Hamilton, LLP, Philadelphia, PA, Leon R. Barson, Mark W. Drasnin, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for plaintiff.

James J. Rodgers, Dilworth Paxson LLP, Philadelphia, PA, for Keymarket of NEPA, Inc., defendant.

James J. Rodgers, Dilworth Paxson LLP, Philadelphia, PA, Christie M. Callahan, Philadelphia, PA, for Sinclair Radio of Wilkes Barre Licensee, Inc., defendant.

### *MEMORANDUM*

VANASKIE, Chief Judge.

The focus of this protracted case is a Federal Communications Commission ("FCC") FM operating license under the call letters WKRF that has been transferred several times. The original holder of this license, Tiab Communications Corp. ("Tiab"), has challenged the transfer of the license by its transferee, Crystal Castle, Inc. ("Crystal") to Keymarket of NEPA, Inc. ("Keymarket"), as well as Keymarket's transfer of the license to Sinclair Radio of Wilkes–Barre License, Inc. ("Sinclair"). Tiab essentially contends that the transfers should be deemed fraudulent under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. Cons.

Stat. Ann. §§ 5101–5110 (West 1999). After two preliminary injunction proceedings, extensive discovery, and unsuccessful settlement efforts, the matter proceeded to a non-jury trial. Having carefully considered the evidence and the pertinent authorities, I find that Keymarket and Sinclair are liable to Tiab under PUFTA.

## I. PROCEDURAL HISTORY

On April 21, 1997, Tiab filed a complaint against Keymarket in connection with Keymarket's acquisition of the FM operating license from Crystal. Tiab had sold the FM license to Crystal in August of 1994 in exchange for Crystal's agreement to assume certain debts of Tiab that exceeded $600,000. (Pl. Exhibit ("PX") 1.) The April 10, 1995 agreement between Crystal and Keymarket had called for Keymarket to pay Crystal $50,000 and to assume Crystal's indebtedness, including the unsatisfied obligations of Tiab that Crystal had assumed under its agreement with Tiab. (PX–3.) The liabilities approximated $500,000. (*Id.*) Subsequent to obtaining FCC approval of the transfer of the FM license from Crystal to Keymarket on June 2, 1995, Crystal and Keymarket executed an amendment to their agreement that dramatically reduced the amount of Crystal's liabilities that were to be assumed by Keymarket. (PX–5.) Tiab claimed that the amended transaction effected a fraudulent transfer intended to preclude Crystal from performing its contractual commitment to satisfy Tiab's indebtedness.

Shortly after commencing this action, Tiab filed a motion for preliminary injunction to restrain Keymarket from transferring the FM license to Sinclair. (Dkt. Entry 4.) By Memorandum and Order of August 7, 1997, I concluded that Tiab had established a reasonable likelihood of prevailing on its claim that the Crystal/Keymarket transaction violated PUFTA. (Dkt. Entry 17.) Because the proceeds from the sale of the WKRF–FM license to Sinclair represented Keymarket's only unencumbered asset that could be used as a source from which claims of Tiab's creditors could be satisfied, Tiab's motion for preliminary injunction was granted, and Keymarket was directed to deposit the proceeds of the sale of the FM license ($150,000) in an interest bearing account, with the account being maintained pending final adjudication of this case or until otherwise ordered by the Court. (*Id.*) Entry of the preliminary injunction, however, was conditioned upon Tiab's posting of a bond in the amount of $25,000 to protect Keymarket if it was found that the preliminary injunction should not have been issued. Tiab did not post the bond and the preliminary injunction did not become effective.

A case management conference was conducted on November 5, 1997, as a result of which deadlines were established for completion of discovery and the filing of dispositive motions. (Dkt. Entry 23.) On December 17, 1997, Tiab moved to amend the complaint to add Sinclair as a defendant. Tiab, however, failed to file a brief in support of its motion, as a result of which the motion was denied by Order entered on July 28, 1998. (Dkt. Entry 29). Tiab's motion for reconsideration of the Order denying the motion to add Sinclair as a defendant (Dkt. Entry 30) was granted by Order entered on November 20, 1998. (Dkt. Entry 36.) Tiab was directed to file its amended complaint within twenty (20) days. Tiab, however, did not comply with this directive. On March 9, 1999, Tiab changed counsel. (Dkt. Entry 37.) Following a telephonic status conference conducted on April 21, 1999, Tiab was granted leave to file its amended complaint. (Dkt. Entry 39.) Finally, on May 11, 1999, Tiab filed the amended complaint adding Sinclair as a defendant. (Dkt. Entry 41.) Thereafter, by Order entered on July 9, 1999, new deadlines for the comple-

tion, of discovery and filing of dispositive motions were established. (Dkt. Entry 45.)

On October 22, 1999, Tiab moved for a preliminary injunction to restrain Sinclair from transferring the WKRF–FM license to Entercom Communications Corp. ("Entercom"). (Dkt. Entry 48.) Disposition of this second preliminary injunction motion was deferred pending settlement efforts. After the settlement discussions proved unsuccessful, the motion was referred to United States Magistrate Judge Thomas M. Blewitt, who conducted evidentiary hearings in May and July of 2000. By Report and Recommendation filed on October 19, 2000, Magistrate Judge Blewitt proposed that the motion for a preliminary injunction be denied. (Dkt. Entry 98.) After consideration of objections to Magistrate Judge Blewitt's report and recommendation, Tiab's preliminary injunction motion was denied by Order of November 1, 2000. (Dkt. Entry 104.)

A non-jury trial was conducted on April 25, 2001. At trial, the defendants called two witnesses: Robin Smith, the Chief Financial Officer of Sinclair, and Kerby Confer, the president and sole shareholder of Keymarket. By stipulation, the parties incorporated into the trial record the testimony and exhibits introduced during the previous preliminary injunction hearings. The parties filed post-hearing briefs and reply briefs, thereby completing the record.

## II. FINDINGS OF FACT [1]

### A. The Parties

1. At the time this action was filed, plaintiff Tiab was a Pennsylvania corporation with its principal place of business in Mount Pocono, Pennsylvania. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 1.)

2. At all times material to this action, Jeff Woehrle was the sole officer, director and stockholder of Tiab and is personally liable for the debts of Tiab. (*Id.*, Finding of Fact No. 2.) Currently, Tiab is 100% owned by Nassau Broadcasting Holdings, Inc. Tiab is now a reorganized debtor pursuant to the terms of a reorganization plan proposed by Nassau and confirmed by the Bankruptcy Court for the Middle District of Pennsylvania.

3. Crystal Castle was a Pennsylvania corporation. Stacey DeWitt was the president and sole shareholder of Crystal. (*Id.*, Finding of Fact No. 7.)

4. Defendant Keymarket is a Georgia corporation with its principal place of business in Augusta, Georgia. At all pertinent times, Kerby Confer was the President and sole shareholder of Keymarket, and Donald J. Alt was the Vice President, Secretary, and Treasurer of Keymarket. (*Id.*, Findings of Fact Nos. 3–4.)

5. Defendant Sinclair is a Maryland corporation with its principal place of business in Baltimore, Maryland.

### B. Tiab's Transfer of the FM License to Crystal

6. On or about August 29, 1994, Tiab entered into a sales agreement with Crystal whereby Crystal was to purchase an FM radio station with call letters WKRF–FM (formerly WPMR–FM), the FCC operating license, and related items in consideration for, *inter alia*, Crystal's as-

---

1. The findings of fact are made pursuant to Fed.R.Civ.P. 52, which provides that "[i]n all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon." Essentially, the findings of fact set forth in numbered paragraphs provide the context for ultimate conclusions on matters such as fraudulent intent and valuation, which are made in the Discussion section of this opinion.

sumption of certain debts owed by Tiab totaling more than $600,000. (PX–1.)

7. Following approval by the FCC, the assignment of the FM license from Tiab to Crystal was completed on November 1, 1994. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 6.)

8. The sole shareholder of Crystal, Stacey DeWitt, had served as the sales manager at Tiab for a year prior to the closing of the sale between Tiab and Crystal. (*Id.*, Finding of Fact No. 7.)

## C. Crystal's Transfer of the FM License to Keymarket

9. In early 1995, defendant Keymarket entered into negotiations with Crystal for the purchase of the WKRF–FM radio station and the FCC operating license. Keymarket was interested in the purchase of WKRF–FM in order to rebroadcast the signal of a popular FM station owned by Keymarket in the Wilkes–Barre region, WKRZ, to expand the geographic reach of that station. (Stipulation of Facts, Dkt. Entry 77 ("Stip."), ¶ 25.)

10. On April 10, 1995, an Asset Purchase Agreement for the WKRF–FM radio station, the FCC operating license, and related items was executed between Crystal and Keymarket. (PX–3.)

11. Included in the consideration due from Keymarket to Crystal for this transfer was Keymarket's assumption of Crystal's debts, including the unsatisfied obligations of Tiab that Crystal had assumed under the August 29, 1994 Agreement, and a payment of $50,000 to Crystal. (PX–3, ¶ 4.)

12. At the time this Agreement was executed, many of the operating assets used in the radio station were the subject of equipment leases. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 10.)

13. Among the scheduled debts that Keymarket agreed to assume was the indebtedness of $162,418 on equipment leases held by, *inter alia*, Dean Kresge, t/a Phonetic Services, Inc. This lease covered essentially all of the assets used in the operation of the radio station. (*Id.*, Finding of Fact No. 11.) The debts of Tiab that Keymarket agreed to assume also included $173,300 (exclusive of accrued interest) to William and Marjorie Woehrle, and $32,512 to George Marcinek, CPA. (PX–3, Ex. D.) In total, the indebtedness assumed by Keymarket as of April 10, 1995 was $473,692.90. (*Id.*)

14. Crystal and Keymarket also entered into an agreement that allowed Keymarket to begin rebroadcasting the WKRZ signal over Crystal's license. (PX–20.) The FCC was apprised of this agreement. (*Id.*)

15. Prior to June 16, 1995, Tiab was made aware of the existence of the Keymarket/Crystal transaction and Tiab was assured that Keymarket would take care of the Tiab/Crystal creditors. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 12.)

16. Jeff Woehrle relied on those assurances as well as exhibit "D" of the April 10, 1995 Agreement, which evidenced Keymarket's intent to assume the debts of Tiab and Crystal, to convince Tiab's creditors that Keymarket would satisfy their claims. (*Id.*, Finding of Fact No. 13.)

17. The FCC approved the assignment of the license from Crystal to Keymarket on June 2, 1995. (*Id.*, Finding of Fact No. 14.)

18. Shortly after this approval, Keymarket's Donald Alt wrote a memo to Kerby Confer, the President of Keymarket, and Robert Wright, Keymarket's counsel. In this memo, Alt stated:

> Wow! The FCC granted the transfer of [the FM License] on Friday denying the two petitions to deny.

We should still wait for "finality" because the LMA petitioners will likely ask for reconsideration and our agreement nonetheless remains in place.

We do though have to review the transaction and amend if necessary to better protect ourselves from possible litigation.

(PX–11.)

19. On June 16, 1995, subsequent to FCC approval of the transfer of the FM license, Crystal and Keymarket executed an Amendment to their April 10, 1995 Asset Purchase Agreement. (PX–5.)

20. The Amendment, *inter alia*, reduced the cash consideration to be paid by Keymarket to Crystal from $50,000 to $25,000. Moreover, it substantially reduced the amount of Crystal's liabilities that were to be assumed by Keymarket. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 16.)

21. None of the obligations of Tiab assumed by Crystal in the August 29, 1994 transfer, which were to have become the ultimate responsibility of Keymarket under the original agreement between Crystal and Keymarket, were included in the schedule of debts assumed by Keymarket pursuant to the June 16, 1995 Amendment. (*Id.*, Finding of Fact No. 17.) In particular, the schedule of indebtedness assumed by Keymarket under the amended agreement excluded the Kresge equipment lease of $162,418, the Woehrles' claim of approximately $200,000, and the $32,512 claim of Mr. Marcinek. (*Compare* PX–3, Ex. D, *with* PX–5, Ex. D.)

22. The value of Crystal's obligations assumed by Keymarket in the original Asset Purchase Agreement of April 10, 1995, including those originally incurred by Tiab, was approximately $473,693. (PX–1, Ex. D.) The amount of Crystal's debt assumed by Keymarket pursuant to the terms of the June 16, 1995 Amendment to the Agreement was reduced to $34,000. (*See* PX–5.) [2]

23. None of the creditors of Tiab or Crystal were informed of this Amendment in advance of its execution; nor was their consent or approval sought. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 20.)

24. The transfer of the station assets, including its FCC license, was consummated by the parties on June 16, 1995. (*Id.*, Finding of Fact No. 21.)

25. Crystal was subsequently forced into bankruptcy by its creditors and has consented to an order for relief under the provisions of 11 U.S.C. § 701 *et seq.* (*Id.*, Finding of Fact No. 23.)

26. Crystal was insolvent from its inception because it assumed liabilities that could not be paid through the station's activities in the ordinary course of business. (*Id.*, Finding of Fact No. 24.)

27. The June 1995 Amendment to the Asset Purchase Agreement was intended to bring difficult creditors of Crystal and Tiab to the bargaining table with the hope that they could be persuaded to take a less hardline approach with regard to their claims.[3] (July 29, 1997 Notes of Testimony ("N.T.") at 91–104.)

---

**2.** The principal obligation assumed was for withholding taxes of $25,000. Keymarket paid approximately $17,000 to satisfy this indebtedness. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 18, n. 1.)

**3.** Keymarket claims that the Amendment was necessary because Crystal was unable to obtain free and clear ownership of the operating assets and, therefore, it was unable to perform under the terms of the Asset Purchase Agreement. (Def. Post–Trial Brief, Dkt. Entry 120, at 5.) As will be shown, this claim is not credible.

28. The majority of the tangible assets transferred from Crystal to Keymarket were owned by Phonetic Services. These assets were leased by Crystal. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 26.) Keymarket was aware of this equipment lease before entering into the original agreement. (Alt Dep. at 100.)

29. Despite being unable to obtain unencumbered ownership of these assets, Keymarket made use of these assets from the day it obtained the FCC license on June 16, 1995. (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, Finding of Fact No. 27.)

30. Keymarket incurred expenses of approximately $97,000 in the Crystal–Keymarket transaction, which included rental of premises owned by Mt. Pocono Broadcasting, Inc. (PX–14.)

31. Following the acquisition of Crystal's assets, Donald Alt of Keymarket made attempts to negotiate the reduction of the Tiab debts that had been assumed by Crystal and which would have been assumed by Keymarket under the April 10, 1995 Agreement. (PX–16, 18, and 22.)

### D. Sale of Substantially All of Keymarket's Assets to River City Broadcasting

32. While Keymarket was negotiating to purchase the WKRF–FM radio license from Crystal, it was also negotiating to sell all of its assets to River City Broadcasting, L.P. (Stip., ¶ 40.)

33. On or about May 31, 1995, while the application to transfer the WKRF–FM license was pending before the FCC, Keymarket sold substantially all of its assets to River City. (Stip., ¶ 8.)

34. River City began rebroadcasting WKRZ programming over the WKRF–FM license and paid operating expenses after the sale of Keymarket's assets to River City. (Stip., ¶ 43.) There was no written agreement for the rebroadcasting of the WKRZ signal, and the FCC was not made aware of this arrangement. (Stip., ¶¶ 43–44.)

35. Immediately after the Keymarket/River City transaction, Alt became the chief financial officer of River City's radio division, while Confer became CEO of the division. (Stip., ¶ 42.)

36. The WKRF–FM license obtained from Crystal was not sold to River City.

37. There is no written agreement pursuant to which River City obtained an option to purchase the WKRF–FM license from Keymarket. (Stip., ¶ 47.) Nor was any summary of an oral option agreement filed with the FCC. (Stip., ¶ 48.)

38. Keymarket did not receive any consideration from River City for an option to acquire the WKRF–FM license. (Alt Dep. at 40–41.)

39. After the River City/Keymarket transaction, Keymarket's only asset was the FCC license to operate the radio station WKRF–FM.

### E. River City's Sale of Assets to Sinclair

40. In April 1996, River City agreed to sell its television and radio stations, including WKRZ–FM, to Sinclair for $1.1 billion. (PX–31.) At this time, Keymarket continued to retain the WKRF–FM license.

41. At the time of or just after the sale of River City's assets to Sinclair, Confer became the "CEO designate" for Sinclair and later the CEO in charge of the Radio Division. (Stip., ¶¶ 17, 19.)

42. There is no written assignment of an option to acquire the WKRF–FM license from River City to Sinclair. Keymarket did not receive any notice of an assignment of an option to acquire the WKRF–FM license from River City to Sinclair. (Alt Dep. at 43.)

43. The transaction between River City and Sinclair included options to acquire twelve radio stations. (Stip., ¶ 55.) The WKRF–FM license was not included among the twelve radio stations for which Sinclair had obtained options. (*Id.*)

44. The agreement setting forth the terms of the options on the twelve radio stations was in writing. (Stip., ¶ 57.)

45. The Sinclair 10K form filed with the S.E.C. for the year ended 1996 identifies each of the stations for which Sinclair obtained an option to purchase. (PX–39.) The WKRF–FM license is not listed on the Sinclair 10K form for the year ended 1996.

46. No written summary of an option to purchase the WKRF–FM license by Sinclair was ever filed with the FCC. (Stip., ¶ 58.)

47. The only reference to the WKRF–FM license in the River City/Sinclair agreement is found in Schedule 1.1(e), which, in pertinent part, provides:

> Option agreement regarding WKRF–FM, formerly known as WPMR (FM), Tobyhanna, Pennsylvania, and WPMR (AM) Tobyhanna, Pennsylvania *to the extent entered into between [River City] and [Keymarket], substantially in the form provided to [Sinclair]*, with changes reasonably acceptable to [River City] and (related documents).

(DX–10; emphasis added.) No document purporting to set forth an option between River City and Keymarket was ever presented to Sinclair.

48. After the consummation of the sale of River City's assets to Sinclair, Sinclair continued to rebroadcast WKRZ programming over the WKRF–FM license. (Stip., ¶ 51.) There was no written rebroadcast agreement between Keymarket and Sinclair in connection with the WKRF–FM license. (Stip., ¶ 52.)

**F. Keymarket's Sale of the WKRF–FM License to Sinclair**

49. On March 12, 1997, an Asset Purchase Agreement was executed for the sale of the WKRF–FM license from Keymarket to Sinclair. (DX–7.) The Asset Purchase Agreement does not refer to any option to purchase the license having been acquired from River City.

50. Sinclair agreed to pay Keymarket $150,000 for transfer of the FM license. Sinclair did not assume any of Tiab's or Crystal's debts as consideration for this transfer.

51. Sinclair valued the WKRF–FM license as of May 31, 1996 at $595,000. (July 10, 2000 N.T. at 22; PX–25.)

52. On May 20, 1997 the FCC approved the transfer of the FM license from Keymarket to Sinclair.

**G. Sinclair's Sale of the WKRF–FM License to Entercom**

53. On August 18, 1999, Sinclair entered into an agreement with Entercom, wherein Entercom agreed to purchase certain radio license and non-license assets from Sinclair. (Stip., ¶ 68.)

54. The transfer of the WKRF–FM license was carved out of the transaction, pending approval of the transfer application by the FCC. The FM license was assigned a value of $600,000 by Sinclair and Entercom for purposes of the carve out. (July 10, 2000 N.T. at 26.)

55. After this Court denied Tiab's motion for a preliminary injunction to enjoin the transfer of the FM license to Entercom, Sinclair transferred the license to Entercom and received $600,000 in exchange.

## III. DISCUSSION

### A. The Pennsylvania Uniform Fraudulent Transfer Act

The Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, ... if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" was insolvent at the time of the transfer or became insolvent as a result of it. 12 Pa. Cons.Stat. Ann. § 5104 (West 1999). The first provision provides for liability under an "actual intent" theory of fraud, while the second is a "constructive fraud" provision.

*In re Blatstein,* 192 F.3d 88, 96 (3d Cir. 1999). Thus, there are two avenues under which a court may find a fraudulent conveyance. If a transfer was made with actual intent to hinder, delay or defraud any creditor of the debtor, the transfer is fraudulent under § 5104(a)(1). If the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer and the debtor did not receive reasonably equivalent value in exchange for the transfer, the transfer is "constructively" fraudulent[4] under § 5104(a)(2) and § 5105.

### B. The Crystal–Keymarket Transaction

#### 1. Fraudulent Intent

The existence of fraudulent intent may be inferred from all facts and circumstances surrounding the conveyance. *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 213 (3d Cir.1990). PUFTA sets forth circumstances from which fraudulent intent may be inferred. These circumstances include whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. Cons.Stat. Ann. § 5104(b) (West 1999). "PUFTA does not require proof to set aside a transfer that the debtor intended to defraud the *specific* creditor bringing the fraudulent transfer claim." *In re Blatstein,* 192 F.3d at 97 (emphasis in original).

---

**4.** That is to say, the intent required to find a transfer to be fraudulent is constructive, rather than actual.

Intent to defraud any creditor is sufficient under PUFTA.

■ Consideration of the § 5104(b) factors and the circumstances surrounding the transfer of WKRF–FM from Crystal to Keymarket compels a finding of fraudulent intent. It is undisputed that Crystal was insolvent at the time of its April 10, 1995 Asset Purchase Agreement with Keymarket and the subsequent Amendment to that Agreement (indeed, Crystal was never solvent). Furthermore, Crystal transferred all, or substantially all, of its assets to Keymarket.

The timing of the original Agreement between Crystal and Keymarket and the Amendment to that Agreement, along with the sequence of events both preceding and following the Amendment, supports the conclusion that Keymarket and Crystal acted with fraudulent intent under § 5104(b). The original April 10, 1995 Asset Purchase Agreement provided that Keymarket would assume the outstanding debts and liabilities of Crystal, including those which Crystal had assumed from Tiab in their August 29, 1994 transaction. Prior to the execution of the Agreement, Donald Alt of Keymarket had made assurances to the creditors of Tiab and Crystal that Keymarket would take care of Crystal's debts. After Keymarket obtained FCC approval of the transfer, however, Keymarket and Crystal executed an Amendment to the Agreement. No advance notice was given to the creditors of Tiab or Crystal (another § 5104(b) factor).[5] This amendment omitted Keymarket's prior assumption of the debts owed those creditors. Critically, this Amendment came after unsuccessful attempts by Keymarket to negotiate with creditors to satisfy their claims and obtain ownership of the station's physical assets free and clear of encumbrances. The logical inference from these circumstances is that, because Tiab's creditors were unwilling to agree to Keymarket's terms regarding the satisfaction of their claims, Keymarket chose to renounce any obligation on its behalf with regard to these claims in order to increase its bargaining leverage. This inference is further supported by the fact that Keymarket continued to negotiate the satisfaction of these debts after June 16, 1995, i.e., Keymarket attempted to employ its new found leverage.[6]

■ Keymarket argues that several of the § 5104(b) factors indicate lack of fraudulent intent. Specifically, Keymarket insists that it was not an insider of Crystal and that the transfer of the station and license was part of an arm's length transaction. (Def. Post–Trial Brief, Dkt. Entry 120, at 8.) Tiab, however, need not show that all of the § 5104(b) factors indicate fraudulent intent. *See* 12 Pa. Cons.Stat. Ann. § 5104(b)("consideration may be given, among other factors …"). If the

---

5. The defendants claim that Tiab and the creditors had notice. They contend that Tiab obtained a copy of the Asset Purchase Agreement within days of its execution. (Def. Post–Trial Brief, Dkt. Entry 120, at 9.) Defendants do not claim, however, that Tiab learned of a possible amendment to the Asset Purchase Agreement prior to its execution. The Agreement's provision that Crystal was to deliver the station assets free of all encumbrances was certainly not sufficient notice that the contract would be modified if Keymarket was unable to resolve equipment lease liabilities on its own terms.

6. Keymarket may be correct that this continued negotiation with the creditors demonstrated Keymarket's "genuine interest in obtaining the operating assets of the station … and a resolution of all outstanding· claims." (Def. Post–Trial Brief, Dkt. Entry 120, at 10–11.) Resolution of the creditor's claims on Keymarket's terms due to the June Amendment, however, also supports an inference of an intent to hinder, delay, or defraud Crystal's creditors, including Tiab.

debtor intended to hinder or delay a creditor, "he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *In re Blatstein,* 192 F.3d at 97.

Keymarket repeatedly argues that the Amendment was executed because, by the terms of the original Agreement, Crystal could not perform in that it was unable to deliver the assets free and clear of encumbrances. (Def. Post–Trial Brief, Dkt. Entry 120, at 9.) These encumbrances, consisting primarily of leases on operating equipment, were known to Keymarket before the original agreement was executed. Furthermore, Donald Alt of Keymarket indicated an entirely different reason for the Amendment in his June memo to Confer and Wright, in which he stated that "[w]e [Keymarket] do though have to review the transaction and amend if necessary to better protect ourselves from possible litigation." (PX–11).[7] This "litigation" referenced in the memo was litigation with the creditors of Tiab, now the creditors of Keymarket.

Furthermore, Keymarket's proffered justification is belied by the fact that not all of the debts of Tiab and Crystal that were assumed by Keymarket in the original Agreement were secured by physical assets. Specifically, no evidence has been presented that the debts owed to the Woehrles and Marcinek were secured by any assets of Crystal.[8] These debts of Tiab were assumed by Keymarket in the original Agreement, but were omitted in the Amendment. Crystal's failure to deliver assets free and clear of encumbrances has no relevance to the omission of these debts.

Keymarket suggests that whether these specific debts were related to the particular operating assets is irrelevant because the Asset Purchase Agreement explicitly conditioned Keymarket's performance on Crystal transferring operating assets. (Def. Post–Trial Brief, Dkt. Entry 120, at 10.) The lion's share of the consideration to be paid by Keymarket in the April 10, 1995 Agreement, however, was the assumption of Crystal's debt and the right to negotiate with the creditors on the claims assumed. Payment of these claims, which Keymarket assumed in the Agreement, would have allowed transfer of the station and equipment free and clear of encumbrances. Thus, Keymarket's claim—Crystal's failure to settle or pay claims which were to be assumed by Keymarket serves as a legitimate basis for amending the Agreement—is not credible. *See Apalucci v. Agora Syndicate, Inc.,* 145 F.3d 630, 634 (3d Cir.1998)("As a general rule, when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."). As Tiab rightly notes, "[h]ad Keymarket paid the obligations it contracted to assume, the equipment and other assets would have been conveyed free of encum-

---

7. Frank Martens, counsel for Crystal, testified during the first preliminary injunction hearing that the reason for the Amendment was to "protect the FM license and not subject it to the jurisdiction of the local courts .... [and] to get the creditors who were taking a hard line approach to be more reasonable in their compromise negotiations." (7/29/97 N.T. at 91–92.) Martens also stated that the "[i]t was [Crystal's] hope that by cooperating with Keymarket on—in this agreement, that the creditors who we had disputed claims with were going to come to the bargaining table in the hopes of compromising their claims." (*Id.* at 104.)

8. Keymarket contends that the debts owed to the Woehrles and to Kresge were of "questionable validity." (Def. Post–Trial Brief, Dkt. Entry 120, at 8.) This, however, does not justify re-writing an agreement to negate the assumption of those debts, thereby reducing dramatically the consideration to be paid.

brances." (Pl. Post–Trial Brief, Dkt. Entry 119, at 19.) [9] ·

As will be discussed below, Keymarket also failed to convey reasonably equivalent value to Crystal for the WKRF–FM station and license, another § 5104(b) factor. Therefore, after considering the totality of the circumstances surrounding the Crystal–Keymarket transaction, I find that Keymarket acted with fraudulent intent in amending the Asset Purchase Agreement to avoid the debts it had earlier assumed in exchange for the WKRF–FM station.

**2. Reasonably Equivalent Value**

■ The Crystal–Keymarket transaction was also fraudulent because Keymarket failed to pay reasonably equivalent value to acquire the station and the license.[10] Section 5105 states that a transaction is fraudulent "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.". 12 Pa. Cons.

Stat. Ann. § 5105 (West 1999). "[I]f the grantor is in debt at the time of a transfer PUFTA places *on the grantee* the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance." *In re Blatstein*, 192 F.3d at 98 (citing *Elliott v. Kiesewetter*, 98 F.3d 47, 56–57 (3d Cir.1996))(emphasis in original). As Crystal (the grantor) was insolvent at the time of the Crystal–Keymarket transaction and had assumed Tiab's debt's, the burden falls on Keymarket (the grantee) to show that it gave reasonably equivalent value for the station and license.

The original Agreement had called for Keymarket to pay Crystal $50,000 and assume all of Crystal's debts, which were approximately $473,693 at that time. After the Amendment, the cash price to be paid to Crystal was reduced to $25,000 and the amount of Crystal's debt assumed by Keymarket was reduced to approximately $34,000. (PX–5.) [11] Only two years later, Keymarket agreed to assign the FCC li-

9. Keymarket also claims that "obtaining the operating assets was not the only consideration, since ... it would have nonetheless faced the claims of not only the creditors listed in the Asset Purchase Agreement, but also those who were not, including the Tiab shareholders who objected before the FCC to the transfer of the FM license from Crystal to Keymarket." (Def. Post–Trial Brief, Dkt. Entry 120, at 10.) Keymarket has neither identified nor quantified the non-listed claims. Thus, the specter of unknown creditors is not a credible explanation for Keymarket's amendment of its agreement with Crystal. Instead, the logical explanation for the amendment was to defeat the claims of Crystal's creditors, which, of course, included Tiab's creditors.

10. Keymarket received more than an FCC operating license. It also received essentially free use of the entire radio station and all the attendant items and equipment needed to

broadcast. Although Keymarket argues that many of the assets it received from Crystal were subject to an equipment lease, Keymarket (and later River City and Sinclair) nevertheless made use of these assets from the day it obtained the FCC license for the station on June 16, 1995.

11. It should be noted that in an accounting made to the Chapter 7 Trustee of Crystal, counsel for Keymarket indicated that $77,060.40 had been paid either to or on behalf of Crystal, and an agreement had been executed pursuant to which Keymarket had agreed to pay $20,000 to Mount Pocono Broadcasting, Inc., which owned the premises from which WKRF–FM operated. (PX–14.) This $20,000 payment appears to have been made to cover claims for unpaid rent. Of course, Keymarket and its successors had been using the premises in question since Crystal's transfer of the FM license to Keymarket.

cense alone for consideration nearly three times more ($150,000) than it had agreed to pay for the license and possession of an operating radio station under the amended agreement with Crystal.[12] (DX–7.)

Keymarket argues that it paid a fair market value in exchange for acquiring the FM license in an amount "in excess of $100,000." (Def. Post–Trial Brief, Dkt. Entry 120, at 12.) As noted elsewhere, Keymarket received considerably more than just an FCC license, but also the radio station and its equipment. Tiab presented as evidence two expert reports that demonstrate that the station was worth considerably more than $100,000, even in 1995. The first report, conducted by BIA Consulting, Inc. ("BIA") at the request of Sinclair, (PX–25), concludes that the value of the FCC license—apart from the station equipment—was $595,000 in May 1996. (*Id.*, at tbl. 15.) The second report, conducted by Serafin Brothers, Inc., ("Serafin"), opined that the value of radio station WKRF–FM, including both physical assets and the FM license, was $819,000. (PX–29, at 1–2.)

Keymarket vigorously contests the two appraisals upon which Tiab relies. First, Keymarket contends that the Serafin appraisal of the station was based on the condition of the station after Keymarket and River City had turned it into a success rather than on the condition of the station in spring of 1995. Specifically, Keymarket argues that the Serafin appraisal relied on BIA's 1996 appraisal, which was based on historical audience share ratings of WKRF–FM for the last four calendar quarters (also called "book ratings")—the four quarters during which WKRF–FM was operated by Keymarket/River City. (Def. Post–Trial Brief, Dkt. Entry 120, at

13.) Keymarket insists that reliance on this data was inappropriate because, at the time of the Crystal–Keymarket transaction, the station had failed to turn a profit.

Tiab disputes this interpretation of the expert reports and points to language in both reports that indicates that the historical audience share ratings were not crucial to the experts' opinions. For example, the Serafin report states that "[n]o historical financial result of the Station were provided [to Mr. Serafin] or reported in the BIA appraisal. Nassau believes the Station was not profitable for a considerable period [of] time before June 1995, which, if accurate, has no consequences on the findings of this valuation report." (PX–29, at 5.)

The BIA report also purports to "show the valuation of WKRF as a new station, as of May 31, 1996." (PX–25, at II–7.) The BIA report did use ratings books to determine "the average local commercial share for Class A FM stations located on the fringe of the Wilkes Barre–Scranton market," but the report did not state that it relied solely on WKRF's book ratings (as opposed to similarly situated radio stations) to do so. The report then compared the average local commercial share of a Class A facility on the market fringe with WKRF's signal strength and expected growth and concluded that "[t]his 1.5% local commercial share is *in line with* the local commercial share WKRF has received over the last four books." (*Id.*, at II–7–8, emphasis added.) Thus, the BIA report did not use the performance of WKRF under Confer's management to project the future profitability of the station, but instead used the book reports as a factor in determining general market

12. If Keymarket's argument that an oral option agreement existed between Keymarket and Sinclair is believed, than Sinclair would have paid approximately $445,000 for the *op-tion* to purchase the FM license only a year later. (Def. Post–Trial Brief, Dkt. Entry 120, at 23.)

conditions. This was not an improper use of the book ratings.

Indeed, Keymarket has not shown how reliance on such data would be improper, but states that the book reports reflected only its "successful" operation of the station and that "the only proper way of valuing the FM license is to look at the condition of the station, as it existed in April 1995, from the eyes of a potential purchaser." (Def. Post–Trial Brief, Dkt. Entry 120, at 18.) Yet, reliance on audience share and revenue figures from previous unsuccessful or even incompetent operation of the station would be equally improper. The reports, in contrast, do not rely on either, but rather reflect the assumption that "there were no deficiencies in the Station's equipment, management or operations which would have materially impacted the Station's ability to achieve the projected operating levels, and thereby the Station's value." (PX–29, at 1.)

Keymarket criticizes the reports' assumption that the WKRF–FM station would be run as a duopoly, rebroadcasting Keymarket's WKRZ–FM station. This objection overlooks the fact that Keymarket purchased the WKRF–FM station so that it could rebroadcast it WKRZ–FM station. The value of the WKRF–FM as a rebroadcast station is therefore particularly relevant and the reports' discounting of expenses based on this assumption was proper. Keymarket insists that to value the station one must "look at the condition of the station ... from the eyes of a potential purchaser." If the potential purchaser intended to rebroadcast, the station would have had a higher value. It is difficult to see why the reports should have evaluated the WKRF–FM station as a stand alone station when it was expected and intended not to be run as such.[13]

Finally, Keymarket disputes the notion that the April 10, 1995 Asset Purchase Agreement essentially set a value for the station and the FM license of $523,692.90 ($50,000 cash payment to Crystal plus the $473,692.90 in assumed debts). (Def. Post–Trial Briefs, Dkt. Entry 120, at 17.) Keymarket argues that some of these liabilities were disputed and that it was based on this factor that Keymarket entered into the Agreement.[14] The mere fact, however, that Keymarket believed that it could negotiate with the creditors to achieve an ultimate cost lower than the $523,692.90 figure does not alter the Agreement's objective valuation of the station. If Keymarket was not successful in disputing the liabilities, it would have had to pay the $523,692.90. That Keymarket was hoping for a bargain and did not want to pay full value for WKRF did not change its obligation to pay the full price for the station if it was unsuccessful in negotiating with the creditors.

In conclusion, Keymarket did not exchange reasonably equivalent value for the WKRF–FM station and license. Its payment of less than $100,000 represented a

---

**13.** Indeed, Keymarket's attack on book ratings seems disingenuous since it relies on historical audience share estimates to criticize the reports' projected audience shares for WKRF–FM. According to Keymarket, the reports' projections are too high, as reflected by the book ratings. (Def. Post–Trial Brief, Dkt. Entry 120, at 14–15.) Not only has Keymarket failed to provide any evidence or expert opinions to support the use of its proposed audience share figures, but Keymarket's use of these "historical" figures as opposed to those proposed by the expert reports is inconsistent with Keymarket's other arguments.

**14.** Keymarket relies on its original proposal for Keymarket to pay a total of $350,000 to Crystal to satisfy certain of its debts in exchange for the FM license and the operating assets. (Def. Post–Trial Brief, Dkt. Entry 120, at 17–18.) This proposal, however, was not reflected in the April 10, 1995 Asset Purchase Agreement.

mere fraction of the value of the insolvent Crystal's assets. In this regard, the value of the license alone exceeded $500,000. Therefore, because Crystal was insolvent both before and after the transfer of the station, the Crystal/Keymarket transaction is constructively fraudulent under §§ 5104(a)(2) and 5105.[15]

## C. The Keymarket–Sinclair Transaction

Tiab also contends that the transfer of the station and the FM license from Keymarket to Sinclair was fraudulent under PUFTA. Tiab's first argument, however, that the Crystal–Keymarket and Keymarket–Sinclair transactions should be treated as one single transaction, is without merit.

Tiab contends that both Confer and Alt, officers of Keymarket, became officers of River City shortly after the Crystal–Keymarket transaction and later Confer became a CEO at Sinclair. (Pl. Post–Trial Brief, Dkt. Entry 119, at 21.) This relationship, Tiab asserts, demonstrates that "the point of Keymarket's purchase was to take the FM License and subsequently sell it to another entity with which the principals of Keymarket were associated." (Id.)

The case cited by Tiab, *Voest–Alpine Trading USA v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir.1990), does not compel treatment of the entire series of transactions as one fraudulent transfer. *Voest–*

*Alpine* involved a series of transactions in which the defendants, the owners of a company called Paige Group, and their bank formed a new corporation called Vantage and staged a foreclosure sale in which all the assets of Paige Group were transferred to Vantage. The Third Circuit affirmed the district court's conclusion that in reality this had been a single fraudulent transaction. *Id.* at 212–13. Key to the court's decision was that each portion of the transaction was dependent upon the occurrence of the others. The court held that " '[s]imultaneity' and 'purpose' are key to evaluating [such] transactions." *Id.* at 213 n. 12 (quoting *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir.1986)).

The "simultaneity" evident in *Voest–Alpine* is not present in this case. In *Voest–Alpine*, the six transactions took place almost instantaneously, whereas here Sinclair's acquisition of the WKRF–FM license by way of a March 12, 1997 agreement occurred nearly two years after the Crystal–Keymarket transaction.[16] Thus, Tiab's single transaction theory cannot be accepted. Although River City was foreseen by Keymarket to be the ultimate grantee of the Crystal–Keymarket transaction, a further transfer to Sinclair was not yet contemplated. Even a year later, when River City's radio assets were transferred to Sinclair, the FM license still remained with Keymarket (though

---

15. The fact that Crystal accepted less than fair market value for its assets dispenses with defendants' argument that Tiab must show that Crystal acted with intent to defraud its creditors. (Defendants' Post–Trial Brief at 9.) Receipt of patently inadequate consideration supports a finding that the transfer was constructively fraudulent as to Crystal's creditors, which included Tiab. In this regard, as indicated in the August 7, 1997 Memorandum Opinion, "Tiab was indeed a creditor of Crystal by virtue of Crystal's agreement to assume Tiab's indebtedness. When Crystal and Key-

market agreed that Keymarket would assume the Tiab indebtedness, Tiab necessarily became an intended beneficiary of that transaction." (Aug. 7, 1997 Mem. Op., Dkt. Entry 17, at 12.)

16. The single transaction theory would have more viability had River City acquired the license. As noted above, River City and Keymarket were in active negotiations when Keymarket acquired the WKRF–FM license. Moreover, both Alt and Confer became senior officers of River City.

River City and Sinclair both made immediate use of the radio station for rebroadcasting despite this possession).

Tiab argues more convincingly, however, that the Keymarket–Sinclair transaction was independently fraudulent under § 5104(a)(1). Several of the § 5104(b) factors were present in this transaction. For instance, the Keymarket–Sinclair transfer involved a common insider. Specifically, Kerby Confer, the president and sole shareholder of Keymarket, sold the Keymarket assets to River City shortly after the Crystal–Keymarket transaction. Confer became CEO of the Radio Division at River City, but retained possession of the FM license through Keymarket, where he remained the sole shareholder. After the River City–Sinclair transaction, Confer became a "CEO designate" and later CEO of the Sinclair Radio Division. Confer was an active participant throughout this series of transactions. Keymarket disputes this characterization of Confer's role in the transaction, but Confer's status as an officer of both Keymarket and Sinclair was crucial to the transfer of the FM license. Thus, Confer's role in WKRF–FM's transition from Keymarket to Sinclair raises suspicions.

Additionally, the Keymarket–Sinclair transaction involved a transfer of all of Keymarket's assets.[17] This is another factor under § 5104(b) which suggests that Keymarket acted with fraudulent intent.

Most important, however, is the failure of Sinclair to convey reasonably equivalent value in exchange for the FM license. Sinclair gave Keymarket $150,000 in exchange for the transfer of the WKRF–FM license. As discussed above, the value of the FM license was considerably more than $150,000. Sinclair's own valuation expert opined that the FM license was worth $595,000. (PX–25, at tbl.15.) Sinclair argues that it "did not collude with Tiab or otherwise actively participate in the alleged fraudulent scheme . . . . in fact, it had no contact whatsoever with either Crystal or Keymarket in 1995." (Def. Post–Trial Brief, Dkt. Entry 120, at 19.) Sinclair did, however, have contact with Keymarket in 1996 and 1997. Keymarket was a debtor to Tiab and the Tiab creditors by virtue of the April 10, 1995 Agreement and had extremely close ties to Sinclair—Keymarket's president and sole shareholder was Sinclair's "CEO designate" at the time of the transfer. Sindair failed to convey adequate consideration for the WKRF–FM license. These circumstances warrant the conclusion that Sinclair acted with fraudulent intent under PUFTA.

Sinclair disputes that it failed to exchange reasonably equivalent value for WKRF–FM and claims that it was a good faith subsequent transferee who took for value and thus, under § 5108,[18] is not liable to Tiab. A good faith transferee is one who "acted without fraudulent intent and . . . did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor." 12 Pa. Cons.Stat. Ann. § 5108, cmt. 6 (1993). Sinclair's argument rests primarily on its assertion

---

**17.** As Tiab also argues, Keymarket was rendered insolvent as a result of the transfer of the FM license, its only remaining asset, to Sinclair. (Pl. Post–Trial Brief, Dkt. Entry 119, at 20.) Sinclair paid Keymarket only $150,000 for the FM license, an amount that could not cover the debts Keymarket owed under the April 10, 1995 Asset Purchase Agreement.

**18.** Section 5108 states that if a transfer is voidable in an action by a creditor under § 5107(a)(1), judgment may be entered against "any subsequent transferee other than a good faith transferee who took for value . . . ."

that it acquired an option to purchase WKRF–FM from River City as a "minor part of an arm's length, $1 billion transaction." (Def. Post–Trial Brief, Dkt. Entry 120, at 19.) Sinclair asserts that it paid $445,000 for the option, making the total consideration it paid for the license $595,000. Conceding that there is no written option agreement between Keymarket and River City, as well as no written assignment of the option from River City to Sinclair, defendants argue that it was unnecessary to reduce those contractual undertakings to writing because the option was such a small part of the $140 million transaction between Keymarket and River City, and the assignment of the option was an even smaller part of the $1 billion transaction between River City and Sinclair.

This assertion, however, is not credible. Just because "it is not at all surprising that there was not a separate purchase agreement, setting forth a specific purchase price, for the option on the FM license, which was the smallest part of the Keymarket–River City deal," (Def. Post–Trial Reply Brief, Dkt. Entry 122, at 5), does not mean it is not surprising that the option *was not mentioned in the Asset Purchase Agreement itself.* The size of a transaction cannot justify the lack of evidence showing the existence of a purported option contract, and the evidence presented by the defendants is unconvincing. The defendants argue that "it would have made absolutely no sense for Keymarket to, on the one hand, sell all of its radio stations and licenses to River City and, on the other, acquire and keep the FM license." (Def. Post–Trial Brief, Dkt. Entry 120, at 20.) The argument, however, ignores the fact that other options included in this transaction were memorialized in written agreements.

The Chief Financial Officer of Sinclair, Robin Smith, testified as to the existence

of the option at trial, but her investigation into the option's existence (she was hired by Sinclair the day after the River City–Sinclair transaction) consisted only of verifying its existence with Confer and River City. The defendants also rely on Confer's testimony that he was approached by another party and asked whether he was interested in selling the FM license, but he told the party that Keymarket had already granted an option to purchase the license to another party. Not only is this testimony self-serving, it is not credible.

Defendants assert that the existence of an option is memorialized in three documents. Two of these documents, (DX–8; DX–9), reflect Sinclair's *post*-sale allocation of its River City acquisitions. Sinclair argues that:

> As is typical in the radio industry, the purchase price for the assets acquired by Sinclair in the River City–Sinclair transaction was determined as a multiple of the broadcast cash flow of all of the assets aggregated, and not a sum of the values of each asset. Nonetheless, in order to properly record opening book values for the assets acquired for tax and public reporting purposes, Sinclair had to allocate the purchase price which it paid to River City among the various assets which it acquired, including the WKRF–FM option. This post-transaction allocation was performed in the usual customary manner followed in the case of the transfer of multiple broadcasting properties, beginning with an appraisal of the assets acquired in the respective market areas, including Wilkes–Barre . . . .

> BIA appraised the value of the WKRF–FM license as $595,000 as of May 31, 1996 . . . . However, consistent with the fact that Sinclair had acquired not the FM license, but an option, only the value attributable to the option was recorded on Sinclair's books. That figure was

derived by taking the valuation completed by BIA and subtracting the exercise price of $150,000. [citing DX–8.] Thus, $445,000 of the approximately $1 billion purchase price is attributable to acquisition of the option on the WKRF–FM license. Notably, this same procedure was employed for valuing each of the options acquired in the Wilkes–Barre market, with the result being that $4,477,000 was recorded as an intangible asset on Sinclair's balance sheet. [citing DX–9.]

(Def. Post–Trial Brief, Dkt. Entry 120, at 23–24.)

This post transaction allocation does not show that Keymarket and River City actually entered into an option agreement. Furthermore, aside from the fact that DX–9 was generated after the transaction, there are other documents that indicate the lack of an option agreement. Particularly relevant is the fact that there was a written agreement for each of the twelve other River City stations for which Sinclair had an option to purchase. (Pl. Post–Trial Brief, Dkt. Entry 119, at 23, citing Stip., ¶¶ 55, 57; Sinclair's Response to Second Request for Admissions at No. 3.) While the defendants may be correct that they were not required to put the option agreement in writing, the fact that no other option contract to which Sinclair was a party was oral reflects adversely on the credibility of the evidence put forth by the defendants to show the existence of the option agreement.

Also noteworthy is the failure of Sinclair to list the option in its 1996 10–K form, even though the form purports to list all stations on which Sinclair had an option. (PX–39, at 7–8). Sinclair responds that this was simply a mistake and that it would have been required to list WKRF–FM in the 10–K regardless of any option agreement because Sinclair was rebroadcasting its WKRZ–FM signal through WKRF.[19]

Another document, however, a schedule allegedly attached to the River City–Sinclair Asset Purchase Agreement, (DX–10), also fails to show the existence of an option. The defendants point to this schedule as "list[ing] the option on the [WKRF] FM license as being included in the deal and identifies the [WPMR] AM license as being included to the extent an agreement is entered into." (Def. Post–Trial Reply Brief, Dkt. Entry 122, at 6.) This is a misinterpretation of the plain words of the schedule, which states in full:

> Option Agreement regarding WKRF–FM, formerly known as WPMR(FM), Tobyhanna, Pennsylvania and WPMR(AM), Tobyhanna, Pennsylvania to the extent entered into between Seller and NEPA, substantially in the form provided to Buyer, with changes reasonably acceptable to Seller (and related documents).

(DX–10.) The phrase "to the extent entered," which clearly indicates that an option contract is contemplated but not executed, applies to both the FM and AM stations, not only the AM station.

Even more damning is the 1997 Asset Purchase Agreement between Keymarket and Sinclair for transfer of the FM license. This agreement makes no mention whatsoever of an option in favor of River City being assigned to Sinclair in exchange for $445,000, three times more than Keymarket received for the license itself. As Tiab pointedly notes:

> It strains credulity for Sinclair to contend, as it does now, that a document

---

**19.** Of course, this raises the question of how Sinclair could be rebroadcasting over a station whose FCC license Sinclair supposedly only had an option to purchase. There are no allegations of lease agreements with Keymarket or any payments from Sinclair to Keymarket other than the $150,000.

between Keymarket and Sinclair, two sophisticated parties, would fail to reference the previous payment which Sinclair now contends was made, particularly where both parties were aware of the likelihood of litigation being brought surrounding the circumstances of Keymarket's acquisition of the FM license. (Pl. Post–Trial Brief, Dkt. Entry 120, at 25.) Not only does the sales agreement fail to mention any previous payment by Sinclair, but, incredibly, it makes no reference at all to an option agreement. (*See* DX–7.)

According to the defendants, the lack of a writing is explained by the fact that at the time Keymarket and River City entered into their multi-million dollar transaction, Keymarket had not yet acquired the FM license. (Def. Post–Trial Brief, Dkt. Entry 120, at 21.) Not only does this explanation apply only to River City and not Sinclair, but it is belied by the fact that River City began rebroadcasting over WKRF–FM immediately following the transfer from Keymarket, regardless of any option contract. There were no payments to Keymarket by either River City or Sinclair for the right to rebroadcast during 1995–1997. Thus, the $150,000 payment by Sinclair and the internal docu-

ments' characterization of the "option" appear to be post hoc justifications for River City's and Sinclair's acquisition and use of the station. The evidence decidedly does not show the existence of an option contract.[20]

The $150,000 payment to Keymarket was not reasonably equivalent value for a license that was worth close to $600,000. This fact, together with the other facts and circumstances surrounding the Keymarket–Sinclair transaction discussed above, compels the conclusion that Keymarket had the requisite fraudulent intent for liability under PUFTA, and Sinclair is not a good faith purchaser for value.[21]

## D. Damages

### 1. Compensatory Damages

■ Tiab contends that it is "entitled to $487,842.09 in compensatory damages, representing the amount due by Tiab as a creditor of Keymarket." Tiab calculated its damages by taking the amount of the Tiab debts that were to have been assumed by Keymarket under the April 10, 1995 Asset Purchase Agreement and that were listed in Schedule F of Tiab's bankruptcy petition, with adjustments in amount based upon proofs of claim filed during the bankruptcy proceeding.[22] (Pl.

---

20. It is also significant that no terms of the option in favor of River City have been suggested. For example, there was no deadline by which the option was to be exercised. No consideration was apparently paid for the option. Finally, the price to be paid was vague—the amount Keymarket had invested to acquire the license. It is also noteworthy that the price ultimately paid by Sinclair—$150,000—was considerably more than the amount that Keymarket had expended to acquire the license. All of this causes me to conclude that an option agreement between Keymarket and River City did not exist. The absence of such an option agreement necessarily forecloses an assignment in favor of Sinclair, and its claim to be a good faith purchaser for value necessarily collapses.

21. Sinclair's failure to pay reasonably equivalent value for the FM license, coupled with its failure to show that Keymarket was solvent at the time of the transfer to Sinclair, also compel a determination that the transfer was constructively fraudulent under § 5104(a)(2).

22. Tiab lists the claims as follows:

| | |
|---|---|
| Affinity Long Distance | $ 474.47 |
| American Office Systems | $ 2,397.03 |
| BMI (Dues) | $ 703.72 |
| BMI (Services) | $ 2,513.61 |
| Phonetic Services (Kresge) | $162,418.00 |
| Bell Atlantic | $ 730.14 |
| Denise Moline, Esq. | $ 1,187.83 |
| Excell Plumbing | $ 2,200.00 |
| George Marcinek | $ 38,179.65 |
| Harris/Allied | $ 47,550.55 |
| Jet Data | $ 253.77 |

Post–Trial Brief, Dkt. Entry 119, at 30; Pl. Proposed Findings of Fact, Dkt. Entry 112, ¶¶ 94–101.) In addition, Tiab seeks prejudgment interest.

Tiab's recovery in this case is governed by PUFTA § 5108(b), which, in pertinent part, provides:

> [T]o the extent a transfer is voidable in an action by a creditor under section 5107(a)(related to remedies of creditors), the creditor may recover judgment for the value of the asset transferred, ... or the amount necessary to satisfy the creditor's claim, *whichever is less ....*

12 Pa. Cons.Stat. Ann. § 5108(b)(emphasis added). Tiab is suing as the creditor of Crystal and Keymarket, claiming third-party beneficiary status under the Crystal/Keymarket transaction. The value of the FM license at the time of the transactions in question was approximately $600,000, substantially more than the value that Tiab has ascribed to its claims. Thus, Tiab's recovery is limited to the value of its claims.

Defendants contend that "Tiab's claim as a creditor is limited to the enumerated debts assumed by Crystal which remain unsatisfied." (Def. Post–Trial Reply Brief, Dkt. Entry 122, at 8.) Specifically, defendants assert that "the amount necessary to satisfy the creditor's claim," PUFTA § 5108(b), should be determined on the basis of the claims against Crystal and Keymarket which they agreed to assume *that remain viable.* Defendants state that only three Tiab creditors—Dean Kresge of Phonetic Services, George Marcinek, and

William and Marjorie Woehrle—filed proofs of claim in the Tiab bankruptcy and, according to the defendants, the outside limit of Tiab's recovery should be the aggregate of these three claims. (Def. Post–Trial Brief, Dkt. Entry 120, at 27.) The value of these three claims was $429,084.07.[23] In other words, defendants contend that the maximum amount recoverable is about $60,000 less than the recovery sought by Tiab due to the failure of some of the Tiab creditors, whose claims were to be satisfied by Crystal and/or Keymarket, to file proofs of claim in the bankruptcy proceedings.

Defendants place too much importance on the filing of proofs of claim. While Tiab's reorganization discharged all of its debts, it did not affect Tiab's cause of action against the defendants for the fraudulent transfers.

The Ninth Circuit's decision in *In re Acequia, Inc.*, 34 F.3d 800 (9th Cir.1994), cited by Tiab, supports this conclusion. That case involved a Chapter 11 debtor bringing a postconfirmation proceeding against its former controlling shareholder to set aside as fraudulent transfers, or fraudulent conveyances under state law, distributions made to a shareholder on the eve of the corporation's bankruptcy filing. The Ninth Circuit rejected the shareholder's argument that the fraudulent transfer action was "moot because the corporation paid all unsecured creditors in its plan of reorganization and thereby nullified any foundation for application of the [fraudulent transfer] statute." *Id.* at 807. The

| William and M. Woehrle | $228,486.42 |
| John Carfi | $ 746.00 |

(Pl. Proposed Findings of Fact, Dkt. Entry 112, ¶ 97.) The defendants contend that the payments under the Lease Agreement between Phonetic Services and Crystal would have totaled only $129,934.56, not $162,418.00. (Def. Post–Trial Brief, Dkt. Entry 120, at 29.) Tiab correctly points out, however, that the defendants derive their figure from four years' payment at $ 2,706.97 per month. The term of the lease was for five years and $162,418.00 is the correct figure. (*See* PX–19, at 2.)

23. Tiab notes that an additional proof of claim was filed by John Carfi for $746.00. (Pl. Proposed Findings of Fact, Dkt. Entry 112; ¶ 95.)

court held that the existence of a cause of action depends on whether the creditor had a viable claim against the debtor at the time the bankruptcy petition was filed.

Moreover, the Bankruptcy Code specifically authorizes postconfirmation pursuit of a debtor's bankruptcy causes of action. *See* 11 U.S.C. § 1123(b)(3)(B)("a plan may ... provide for ... the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any ... claim or interest."). Here, Tiab's reorganization plan specifically contemplated this litigation. (*See* DX–13, Plan of Reorganization, ¶ 4.5(ii).) "If the confirmation of a plan of reorganization and subsequent payment of creditors sufficed to eliminate [the fraudulent transfer] causes of action, both section 1123(b)(3)(B) and the litigation-enabling provision of [Tiab's] plan would be pointless." *In re Acequia,* 34 F.3d at 808. Finally, the Ninth Circuit commented on the policy implications of defendants' position: "if confirmation and payment precluded application of [PUFTA], debtors undoubtedly would delay filing plans of reorganization until completing all potential litigation, a result that would contravene the Bankruptcy Code's goal of quick and equitable reorganization." *Id.*

The defendants attempt to distinguish *In re Acequia* by stressing the fact that Tiab is not "the debtor" with respect to the fraudulent transfer claim, but is the creditor, whereas *In re Acequia* involved a fraudulent transfer claim brought by a debtor against the transferee, the former shareholder who transferred funds from the debtor to his personal bank account.

(Def. Post–Trial Reply Brief, Dkt. Entry 122, at 9.) The court's holding, however, was not dependent on the status of the claimant as a debtor. The rationale of *In re Acequia* is just as applicable to a case such as this one where the debtor in bankruptcy is a creditor of the transferees.

Inclusion of the Woehrles' claim in the damage calculation, however, presents a different issue. Tiab filed objections to the validity of the Woehrles' claim, and prevailed when the Woehrles failed to defend the validity of their claim. Thus, unlike the other claims (and the claims in *In re Acequia* ), the Woehrles' claim was neither discharged nor is it still pending. It was disallowed at the instance of Tiab. Despite this fact, Tiab insists that it may still recover for the defendants' failure to satisfy this debt. Tiab argues that a "default judgment ... should not be given preclusive effect where the election not to participate can be seen to be because of the expense associated with defending the lawsuit." (Pl. Post–Trial Brief, Dkt. Entry 119, at 27.) [24]

It is true that collateral estoppel is generally not available on the basis of default judgments.[25] *See In re Docteroff,* 133 F.3d 210, 215 (3d Cir.1997); *In re Parker,* 250 B.R. 512, 517 (M.D.Pa.2000). But the cases on which Tiab relies concerned application of collateral estoppel against the defaulting parties, not the prevailing parties.

Here, Tiab affirmatively sought the judgment against the Woehrles in the bankruptcy proceeding below. The rationale for the Woehrles' decision to allow a

---

**24.** It should be noted that no evidence was presented as to the reasons why the Woehrles chose not to defend the validity of their claim.

**25.** For collateral estoppel to apply: (1) the issue sought to be precluded must be the same as the one involved in the prior action;

(2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment. *See In re Docteroff,* 133 F.3d 210, 214 (3d Cir.1997). It is the second element—actual litigation—that the parties dispute.

default judgment based upon Tiab's objection is not relevant to *Tiab's* decision to file the objection and challenge the claim. The sale from Crystal to Keymarket recognized that certain of the Tiab claims could be disputed. Keymarket's obligation was necessarily limited to claims determined to be valid. Because a determination has been made that the Woehrles' claim is not valid, Keymarket has no responsibility with respect to that claim. Tiab will not now be permitted to take the contrary position that the Woehrles' claim was valid in order to increase its damages. Thus, subtracting the amount of the Woehrles' claim, the defendants are liable in the amount of $259,355.67.

■ The defendants argue, however, that they are entitled to have any judgment entered against them reduced by the value which each gave to acquire the FM license, i.e. the $150,000 paid by Sinclair for the license. They rely on 12 Pa. Cons. Stat. Ann. § 5108(d)(3), which states that "a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to . . . a reduction in the amount of the liability on the judgment." This provision, however, does not apply to the defendants. As concluded above, the defendants were *not* good faith transferees.[26]

Sinclair makes a further equitable argument that, since it paid the $150,000 with the understanding that the funds would be held in escrow until a judgment was rendered, any damage reward should nonetheless be offset by the $150,000. According to Sinclair, it "should not be required to pay the same amount twice merely because Tiab permitted those funds to be

disbursed by failing to post the requisite bond ordered by this Court." (Def. Post–Trial Brief, Dkt. Entry 120, at 29.) A close reading of the Asset Purchase Agreement between Keymarket and Sinclair, however, reveals that the contract required Sinclair to make the $150,000 payment *regardless* of whether the FM license was transferred. (*See* DX–7, ¶¶ 3.2, 14.) Thus, Sinclair was required to pay Keymarket whether or not the $150,000 was to be held in escrow. Furthermore, the agreement was entered into on March 12, 1997—more than four months before this Court issued a preliminary injunction. Sinclair's equitable argument has no merit. Keymarket and Sinclair are not entitled to a $150,000 reduction of their liability to Tiab for $259,355.67.

### 2. Prejudgment Interest

■ In addition to compensatory damages, Tiab also seeks prejudgment interest. The granting of prejudgment interest is a matter committed to the court's discretion, which is guided by consideration of four factors: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against a surcharge. *See Feather v. United Mine Workers*, 711 F.2d 530, 540 (3d Cir.1983); *In re Blatstein*, 260 B.R. 698, 721 (E.D.Pa. 2001).

The second and third factors clearly support an award of prejudgment interest in this case. Prejudgment interest would compensate Tiab for the time-value of

---

**26.** While mere knowledge that a transfer was made for *nominal consideration* from the original transferee is not, alone, a basis for a lack of good faith, it may, "in combination with the transferee's or obligee's knowledge concerning other facts, be relied upon a evidence of a lack of 'good faith' on the part of the transferee or obligee." 12 Pa. Cons.Stat. Ann. § 5108, cmt. 6 (1993). As discussed above, several of the § 5104(b) factors were implicated by both the Crystal–Keymarket and Keymarket–Sinclair transactions.

money which was due it under the obligation Keymarket assumed in 1995. This was money that was unavailable to Tiab for investment or paying off its creditors. Keymarket's argument that prejudgment interest should be denied because this was not an action for a "sum certain" is unpersuasive. (Def. Post–Trial Reply Brief, Dkt. Entry 122, at 11.) The mere fact that the parties disputed the amount of damages does not require finding that the damages were unascertainable at the outset of this litigation. Indeed, the obligation of Keymarket was quite clear—to satisfy the debts it assumed in 1995.

Keymarket's assertion that it was not unjustly enriched is also not credible. Although Keymarket only operated WKRF–FM for a few weeks, and therefore did not receive much in the way of revenues from the station, it benefitted from not fulfilling its obligations. The money Keymarket did not use to pay off the Crystal/Tiab debts was available for other uses. Certainly, this was unjust enrichment. Sinclair likewise benefitted by purchasing WKRF–FM at an excessively low price. Again, this freed up funds that Sinclair otherwise would have had to use to acquire the FM license.

Equitable considerations also weigh in favor of prejudgment interest. Keymarket's amending of the April 10, 1995 Asset Purchase Agreement demonstrates a calculated plan to avoid satisfying the debts assumed in that Agreement. This amendment took place without either Tiab's or the Crystal debtors' knowledge. Keymarket's successors, including Sinclair, benefitted from this avoidance plan and were able to rebroadcast radio signals from WKRZ. Sinclair's ultimate "purchase" of the FM license at a suspiciously low price, with little documentation, also supports an award of prejudgment interest.

The parties vigorously contest the first factor—Tiab's diligence in prosecuting this action. Keymarket and Sinclair point to the fact that, although Tiab knew of the transfer of the FM license to Sinclair since mid–1997, Tiab did not file an amended complaint naming Sinclair as an additional defendant until May 11, 1999. (Def. Post–Trial Reply Brief, Dkt. Entry 122, at 10.) The record bears out this contention. Although Tiab filed a motion to amend the complaint three months after this Court granted Tiab's first motion for a preliminary injunction, (Dkt. Entry 24, dated 12/17/1997), the motion was denied because Tiab failed to submit an accompanying brief with its motion. (Dkt. Entry 29.) After a motion for reconsideration, Tiab was permitted to file an amended complaint within twenty days of the order, which was dated November 20, 1998. Tiab substituted counsel, however, and the amended complaint was not filed for over five months. Furthermore, the record reveals very little activity in this action from the granting of the preliminary injunction motion in August of 1997 until the joinder of Sinclair on May 11, 1999. Tiab should not be allowed to recover damages that are intended to compensate for delay in the ultimate resolution of the controversy when Tiab is the cause of the delay.

The record also discloses, however, that Tiab prosecuted this action with due diligence after Sinclair's joinder in May of 1999. Much of the effort was directed at preventing yet another transfer of the license. The pursuit of preliminary injunctive relief cannot be characterized as frivolous. Nor was it intended to delay the progress of this case. This motions required extensive litigation and careful consideration by this Court. Tiab is not a culpable party with respect to any delay after the joinder of Sinclair.

Tiab proposes that the interest be calculated from the date of Tiab's conversion to a Chapter 11 proceeding, December 24, 1997. (Pl. Post–Trial Brief, Dkt. Entry 119, at 33.) As noted above, Tiab did not prosecute this action in a diligent manner prior to the joinder of Sinclair. Thus, it is not entitled to prejudgment interest during the period of time for which it was responsible for the lack of activity in this case. Instead, considerations of fairness that animate a discretionary award of prejudgment interest are best served by starting the award of prejudgment interest when Sinclair was joined, May 11, 1999.

Under Pennsylvania law, unless otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year. 41 Pa.Stat. Ann. § 202 (West 1999). Thus, the prejudgment interest on $259,355.67, as of May 20, 2003, is calculated to be $62,629.06.

## III. CONCLUSION

For the reasons set forth above, this Court concludes that both defendants engaged in fraudulent transfers of the WKRF–FM license under PUFTA. Therefore, judgment will be entered for Tiab in the amount of $321,984.73 ($259,355.67 in compensatory damages plus $62,629.06 in prejudgment interest). An appropriate Order follows.

### *ORDER*

**NOW, THIS 20th DAY OF MAY, 2003,** for the reasons stated in the foregoing findings of fact and conclusions of law, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court is directed to enter judgment in favor of plaintiff Tiab and against the defendants in the amount of $321,984.73 ($259,355.67 in compensatory damages plus $62,629.06 in prejudgment interest).

2.  The Clerk of Court is directed to mark this matter **CLOSED**.