T.C. Memo. 2004-85


UNITED STATES TAX COURT


SELF HEATING AND COOLING, INC., TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3267-02.                    Filed March 24, 2004.


<u>Barry A. Furman</u>, for petitioner.

<u>Gerald A. Thorpe</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  In a notice of transferee liability dated
September 28, 2001, respondent determined that petitioner was
liable as a transferee for the 1996 income tax liability of Self
Oil Heat, Inc., in the amount of $119,689.71, plus interest
provided by law.  The only issue presented by the parties is

whether petitioner is liable as a transferee of property pursuant to section 6901.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. When the petition was filed, petitioner's principal place of business was in Fort Washington, Pennsylvania.

Background

On July 1, 1971, Self Oil Heat, Inc. (Self Oil), was organized pursuant to the laws of Pennsylvania to engage in, inter alia, the business of selling fuel oil. Self Oil elected to be treated for tax purposes as an S corporation until that election was revoked on or about April 12, 1996. From the date of its incorporation until the date it ceased operations, Robert N. Self, Sr., was Self Oil's president, sole shareholder, and sole director. For part of 1991 and 1992, Robert N. Self, Jr., was Self Oil's secretary and treasurer.[2]

During 1993, Self Oil and its officers became the subject of a joint criminal investigation conducted by Federal and State authorities to determine whether Self Oil, among others, had paid

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the the Tax Court Rules of Practice and Procedure.

[2]Mr. Self, Sr., is the father of Mr. Self, Jr., and Jonathan Self. Mr. Self, Sr., testified that both of his sons were former employees of Self Oil.

the correct amount of excise tax on fuel it purchased and sold. Thereafter, a five-count criminal information was filed against Mr. Self, Jr., charging him with, inter alia, conspiracy to defraud the United States by impeding, impairing, obstructing, and defeating the Internal Revenue Service in the computation, assessment, and collection of fuel excise taxes during 1991 and 1992, wire fraud arising from a scheme to defraud the Commonwealth of Pennsylvania of oil company franchise taxes and the State of New Jersey of motor fuel and gross receipts taxes, and mail fraud arising from a scheme to defraud the Commonwealth of Pennsylvania of oil company franchise taxes. On or about March 24, 1993, Mr. Self, Jr., entered into a plea agreement with the U.S. attorney and pleaded guilty. On July 27, 1994, a judgment of conviction was entered sentencing Mr. Self, Jr., to 5 years of probation and the payment of $15,250 in penalties. A judgment of conviction was also entered against Self Oil requiring it to pay a $45,000 fine and a forfeiture penalty of $243,900.

Petitioner, Self Heating and Cooling, Inc., is a Pennsylvania corporation organized on September 29, 1994, and engaged in the business of selling fuel oil and related activities. On October 1, 1994, petitioner issued 100 shares of its stock to Mr. Self, Jr., and Jeanette A. Self, his wife, and 100 shares to Jonathan Self.

On May 2, 1995, the Department of Taxation of the State of Ohio sent Self Oil a demand for immediate payment of motor fuel tax of $1,745,938.84 plus a 30-percent penalty for a total amount due of $2,269,720.49.  On May 5, 1995, the State of Pennsylvania assessed excise tax liabilities, including interest and penalties, against Self Oil totaling $6,599,435.56.  According to three separate notices of reassessment, all dated April 5, 1996, the State of Pennsylvania notified Self Oil that on the basis of the decision and order that the Board of Finance and Revenue entered on February 27, 1996, Self Oil owed excise tax liabilities, including penalties and interest, totaling $7,029,251.32.

At some point, Mr. Self, Sr., and Mr. Self, Jr., concluded that Self Oil could not continue in business if it remained liable for the excise taxes asserted by Ohio and Pennsylvania. Mr. Self, Sr., and Mr. Self, Jr., had discussions with their attorneys, Maury B. Reiter and William Stewart, concerning a method by which the business of Self Oil could be sold to petitioner.  Mr. Reiter wrote a memorandum dated January 6, 1996, to his file concerning the "Pennsylvania State Motor Fuel Oil Tax Appeal", which states in whole:

> On or about September 29, 1994, WKS [Mr. Stewart] and MBR [Mr. Reiter] met with Robert Self Sr. ("Bob") and Robert Self Jr. ("Rob") regarding an assessment for fuel oil tax arising out of the circumstances which lead to a criminal indictment and settlement.  Specifically, the State claimed a [sic] that Self Oil had engaged in a "daisy chain" for the

purpose of evading the motor fuel oil excise tax. The assessments were for approximately $6 million including penalty and interest. Obviously, if successful, the State would put Self Oil out of business.

A plan was devised by WKS and myself to form a new corporation ("Newco"). Since Self Oil is entirely owned by Bob, and Bob was winding down his involvement in the business, Newco was to be owned by Rob and his brother Jonathan. The idea was to renew all new customers and existing customers in to Newco as well as all new HVAC installations and servicing, while renting the trucks, facilities and utilizing the personnel of Self Oil. The thought was that we can justify creating Newco since Bob wanted to retire but the sons would be unwilling to step in to Self Oil given all of its liability exposure and therefore they would agree to "acquire" the business by paying Bob's company an administrative fee for the right to take over the customers and use Self Oil's infrastructure, with the intent eventually of taking over the personnel, the facilities and buying the equipment and vehicles. <u>By doing this, it was our goal to leave Self Oil with no real value so that an eventual judgement by the State would not impair the ability of continuing the business, albeit through Newco</u>.

In order to allow us to transition the business to Newco, <u>it was agreed that we would appeal the assessments as long as we could to buy time</u>. I therefore started the administrative appeal process with the State, again keeping in mind that the principal goal was delay with the remote possibility of convincing the State it was wrong. Everyone acknowledged that it was very unlikely that we would have any success in the administrative appeal process. We never really evaluated the liklihood [sic] of success in court it being understood that when that time came, we would look at where we were in the transition of the business and determine whether pursuing the case any further was justified. I believe everyone felt the liklihood [sic] of success was not great and that was the reason for accelerating the transition, which in fact occurred. This point was driven home even further when Self Oil later got an assessment from the State of Ohio for approximately $2 million. <u>I believe the general feeling was to drag it out as long as possible and then just walk away and defend any action for transferee liability which the States may attempt</u>.
[Emphasis added.]

On March 25, 1996, Mr. Reiter drafted two letters which gave notice to the State of Pennsylvania that a sale by and between Self Oil and petitioner was scheduled for April 5, 1996. On or about April 15, 1996, Self Oil conveyed substantially all its assets to petitioner pursuant to an asset purchase agreement (agreement).[3] The purchase price was listed in the agreement as $680,000. According to schedule A attached to the agreement, the purchase price was allocated to the assets being purchased as follows:

| Item | Allocation |
| --- | --- |
| Vehicles: | |
|   Vans | $45,200 |
|   Trucks | 21,800 |
| Inventory | 220,620 |
| Customer list | 374,564 |
| Office equipment | 15,000 |
| Goodwill | 2,816 |

According to the agreement, the consideration for the conveyance took the form of petitioner's assumption of various debts of Self Oil: (1) Outstanding loans to Mr. Self, Sr., and his wife totaling $445,419;[4] (2) Self Oil's forfeiture and fine

---

[3]However, according to the agreement, the closing was to take place on Apr. 8, 1996.

[4]During the years preceding the conveyance, Mr. Self, Sr., and his wife had advanced their personal funds to Self Oil so that it could meet its financial needs, the amounts of which were recorded on the corporate books and records as "loans from stockholder"; i.e., unsecured long-term liabilities. When Self Oil conveyed its assets to petitioner, the outstanding balance owed to Mr. Self, Sr., and his wife was $445,419.

obligations to the U.S. Government in the aggregate amount of $163,014; and (3) $71,567 as the balance owed to Harleysville National Bank.[5]

On or about April 15, 1996, Self Oil and petitioner entered into an assignment and assumption agreement (assignment agreement). According to the assignment agreement, petitioner assumed the following Self Oil obligations: (1) $445,419 in loans outstanding to Mr. Self, Sr., and his wife; (2) $56,567 in loans outstanding to Harleysville National Bank;[6] and (3) $163,014 in obligations to the U.S. Government with respect to Self Oil's guilty plea agreement. Subsequently, Self Oil and petitioner orally agreed that the consideration that petitioner provided would comprise the following: (1) Petitioner's assumption of a portion of the debt Self Oil owed to Mr. Self, Sr., and his wife totaling $262,986; (2) petitioner's assumption of fines and forfeitures Self Oil owed to the United States totaling $163,014;[7] and (3) petitioner's assumption of a portion

---

[5]The payments to Harleysville National Bank and to Mr. Self, Sr., set forth in the agreements were based on projected collections of Self Oil's accounts receivable being sufficient to pay off Harleysville National Bank's obligations in full and repay Mr. Self, Sr.'s loan.

[6]See supra note 5.

[7]When Self Oil transferred its assets to petitioner, it owed the United States $163,014 in fines and penalties that Mr. Self, Sr., had guaranteed and petitioner paid.

of the debt Self Oil owed to Harleysville National Bank totaling $254,000.[8]

On April 15, 1996, the fair market value of the assets transferred to petitioner was $680,000. Self Oil was insolvent when it conveyed its assets to petitioner or was rendered insolvent by virtue of the transfer. After transferring its assets to petitioner, Self Oil ceased its business operations. Petitioner continued the fuel oil business from the business premises that Self Oil had previously occupied. Mr. Self, Sr., owned and leased the business premises.

For each of the months of May through December of 1996, petitioner paid Mr. Self, Sr., $5,000, for a total of $35,000. During 1997, petitioner paid Mr. Self, Sr., the following amounts on the dates listed:

| Date | Amount |
|------|--------|
| 1/14/97 | $5,000 |
| 2/10/97 | 5,000 |
| 4/--/97[1] | 5,000 |
| 5/12/97 | 5,000 |
| 5/27/97 | 2,000 |
| 6/9/97 | 5,000 |
| 7/14/97 | 5,000 |
| 8/11/97 | 5,000 |
| 9/26/97 | 5,000 |
| 10/13/97 | 5,000 |
| 11/11/97 | 5,000 |

---

[8]When Self Oil conveyed its assets to petitioner, the unpaid balance owed to Harleysville National Bank was $410,000 on a term note and $195,000 on a revolving line of credit. Mr. Self, Sr., guaranteed these debts. On June 12, 1996, petitioner paid the outstanding balance on the revolving line of credit obligation.

|            |        |
|------------|--------|
| 12/8/97    | 5,000  |
| Total      | 57,000 |

[1]The record does not disclose on what date this payment was made.

During 1998, petitioner paid Mr. Self, Sr., the following amounts on the dates listed:

| Date      | Amount  |
|-----------|---------|
| 1/12/98   | $5,000  |
| 2/16/98   | 5,000   |
| 3/16/98   | 5,000   |
| 4/6/98    | 5,000   |
| 5/11/98   | 5,000   |
| 6/9/98    | 5,000   |
| 7/14/98   | 5,000   |
| 8/10/98   | 5,000   |
| 9/15/98   | 5,000   |
| 10/8/98   | 2,000   |
| 10/13/98  | 5,000   |
| 11/10/98  | 7,000   |
| 12/15/98  | 5,000   |
| Total     | 64,000  |

During 1999, petitioner paid Mr. Self, Sr., $5,000 per month.

During 2000, petitioner paid Mr. Self, Sr., the following amounts on the dates listed:

| Date       | Amount  |
|------------|---------|
| 1/18/00    | $5,000  |
| 2/14/00    | 5,000   |
| 3/13/00    | 5,000   |
| 4/17/00    | 5,000   |
| 5/15/00    | 5,000   |
| 6/21/00    | 5,000   |
| 7/11/00    | 5,000   |
| 8/15/00    | 3,000   |
| 8/--/00[1] | 5,000   |
| 9/6/00     | 2,000   |
| 10/24/00   | 2,986   |
| Total      | 47,986  |

[1]The record does not disclose on what date this payment was made.

On or about April 15, 1997, Self Oil filed Form 1120-S, U.S. Income Tax Return for an S Corporation, for the period January 1 through April 12, 1996, reporting ordinary income of $26,634. On or about August 18, 1997, Self Oil filed Form 1120, U.S. Corporation Income Tax Return, for the period April 13 through December 31, 1996, reporting a tax liability of $123,060. On September 28, 2001, respondent issued a notice of liability to petitioner asserting that it was liable as a transferee of Self Oil's assets for Self Oil's unpaid income tax liability for the taxable year ended December 31, 1996, for $119,689.71.

OPINION

Section 6901 provides a procedural mechanism for collecting unpaid tax from transferees of property in certain circumstances. Hagaman v. Commissioner, 100 T.C. 180 (1993); see Phillips v. Commissioner, 283 U.S. 589 (1931) (relating to the predecessor of section 6901). Section 6901 provides in pertinent part:

SEC. 6901. TRANSFERRED ASSETS.

(a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, estate, and gift taxes.--

      (A) Transferees.--The liability, at
law or in equity, of a transferee
of property--

         (i) of a taxpayer in the case
of a tax imposed by subtitle A
(relating to income taxes),

\*      \*      \*      \*      \*      \*      \*

      (b) Liability.--Any liability referred to in
subsection (a) may be either as to the amount of tax
shown on a return or as to any deficiency or
underpayment of any tax.

At the outset, it should be noted that "In proceedings before the Tax Court the burden of proof shall be upon the Secretary to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax."  Sec. 6902(a); see Rule 142(d).

Whether and the extent to which a transferee is liable is generally determined under State substantive law.  Commissioner v. Stern, 357 U.S. 39, 45 (1958).  "The applicable State law is determined by where the transfer occurred".  Adams v. Commissioner, 70 T.C. 373, 390 (1978), supplemented by 70 T.C. 446 (1978), affd. without published opinion 688 F.2d 815 (2d Cir. 1982).  Since it is undisputed that the conveyance occurred in Pennsylvania, we shall apply that State's substantive law.

"'As a general rule,' under Pennsylvania common law, 'when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's

assets.'" <u>Philadelphia Elec. Co. v. Hercules, Inc.</u>, 762 F.2d 303, 308 (3d Cir. 1985) (quoting <u>McClinton v. Rockford Punch Press & Manufacturing Co.</u>, 549 F. Supp. 835, 837 (E.D. Pa. 1982)). However, where "the transaction is fraudulently entered into to escape liability, a successor corporation may be held responsible for the debts and liabilities of its predecessor." <u>Id.</u> at 308-309 (citing <u>Shane v. Hobam, Inc.</u>, 332 F. Supp. 526 (E.D. Pa. 1971); <u>Granthum v. Textile Mach. Works</u>, 326 A.2d 449 (Pa. Super. Ct. 1974)).

The question of whether a transfer transaction was entered into fraudulently must be answered in the context of Pennsylvania's Uniform Fraudulent Transfer Act (PUFTA). As applicable here, PUFTA provides in pertinent part:

> Sec. 5104.  Transfers fraudulent as to present and
>             future creditors
>
> (a) General rule.--A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay or defraud any creditor of the debtor * * * [12 Pa. Cons. Stat. Ann. sec. 5104(a)(1) (West 1999).[9]]

---

[9]"If the debtor intended to hinder or delay a creditor, 'he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.'" <u>Tiab Communications Corp. v. Keymarket of NEPA, Inc.</u>, 263 F. Supp. 2d 925, 935-936 (M.D. Pa. 2003) (quoting <u>718 Arch St. Associates v. Blatstein</u>, 192 F.3d 88, 97 (3d Cir. 1999)).

"[T]he existence of actual intent is a question of fact". <u>United States v. Tabor Court Realty Corp.</u>, 803 F.2d 1288, 1304 (3d Cir. 1986).

Respondent concedes that Self Oil's asset transfer did not hinder, delay, or defraud his assessment and collection of income tax liabilities. As respondent aptly explains, the income tax liability at issue is attributable to the sale of Self Oil's assets; the income tax liability could not have existed at the time of the transfer. Indeed, respondent contends that Self Oil's desire to frustrate the collection of other creditors, namely, the States of Ohio and Pennsylvania, is a sufficient justification to deem the transfer fraudulent under PUFTA. We agree. The Court of Appeals for the Third Circuit has recently stated: "PUFTA does not require proof to set aside a transfer that the debtor intended to defraud the <u>specific</u> creditor bringing the fraudulent transfer claim. PUFTA deems a transfer fraudulent if the debtor had the 'actual intent to hinder, delay or defraud <u>any</u> creditor'". <u>718 Arch St. Associates v. Blatstein</u>, 192 F.3d 88, 97 (3d Cir. 1999); see <u>Walsh v. Gutshall (In re Walter)</u>, 261 Bankr. 139, 142-143 (Bankr. W.D. Pa. 2001) ("It is not necessary that debtor have intended to hinder all of his creditors for § 5104(a)(1) to apply; it is sufficient that he intended to hinder, delay or defraud 'any creditor'.").

In this case, there is direct evidence of Self Oil's "actual intent". That intent is clearly shown from the file memorandum written by the lawyer who suggested and consummated the transfer transaction. As Mr. Reiter therein explained:

> it was our goal to leave Self Oil with no real value so that an eventual judgement by the State would not impair the ability of continuing the business, albeit through Newco.[10]
>
> * * * I believe the general feeling was to drag it out as long as possible and then just walk away and defend any action for transferee liability which the States may attempt.

At trial, Mr. Reiter did not disavow his memorandum, and although he testified that it was not written contemporaneously with the various meetings, telephone calls, and conversations he had with the Self family, he indicated that it was, nonetheless, accurate. Mr. Reiter was asked and answered as follows:

> Q:   So you wanted to transfer the assets before those liabilities, those excise tax liabilities became liens on the property; isn't that correct?
>
> A:   We wanted to sell them, yes.

We may also infer "actual intent" from all the facts and circumstances surrounding the conveyance. See <u>Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.</u>, 919 F.2d 206, 213 (3d Cir. 1990); <u>Moody v. Sec. Pac. Bus. Credit, Inc.</u>, 127 Bankr. 958, 990 (W.D. Pa. 1991), affd. 971 F.2d 1056 (3d Cir. 1992). PUFTA

---

[10]Mr. Self, Jr., indicated at trial that "Newco" was the name used in place of petitioner.

assists in ascertaining the required intent by listing some

indicative factors:

> (b) Certain factors.**--**In determining actual intent
under subsection (a)(1), consideration may be given, among
other factors, to whether:

>> (1) the transfer or obligation was to an
insider;

>> (2) the debtor retained possession or control
of the property transferred after the transfer;

>> (3) the transfer or obligation was disclosed
or concealed;

>> (4) before the transfer was made or
obligation was incurred, the debtor had been sued
or threatened with suit;

>> (5) the transfer was of substantially all the
debtor's assets;

>> (6) the debtor absconded;

>> (7) the debtor removed or concealed assets;

>> (8) the value of the consideration
received by the debtor was reasonably
equivalent to the value of the asset
transferred or the amount of the obligation
incurred;

>> (9) the debtor was insolvent or became
insolvent shortly after the transfer was made or
the obligation was incurred;

>> (10) the transfer occurred shortly
before or shortly after a substantial debt
was incurred; and

>> (11) the debtor transferred the essential
assets of the business to a lienor who transferred
the assets to an insider of the debtor.  [12 Pa.
Cons. Stat. Ann. sec. 5104(b).]

The enumerated factors are not exhaustive or exclusive,[11] and there is no magic number needed to determine the required intent.[12]  Tiab Communications Corp. v. Keymarket of NEPA, Inc., 263 F. Supp. 2d 925, 935 (M.D. Pa. 2003).  Even conduct subsequent to the transfer may demonstrate the intent that existed at the time of the transfer.  Iscovitz v. Filderman, 6 A.2d 270, 272 (Pa. 1939).

Many of the enumerated indicia are present in this case: (1) Self Oil was already insolvent or made insolvent by virtue of the transfer; (2) the transfer was to a corporation owned by family members who were former employees of the transferor and

---

[11]We note that the statute specifically provides: "consideration may be given, among other factors".  See 12 Pa. Cons. Stat. Ann. sec. 5104(b) (West 1999) (emphasis added).

[12]The committee comment to 12 Pa. Cons. Stat. Ann. sec. 5104 states in pertinent part:

(5) Subsection (b) below is a nonexclusive catalogue of factors appropriate for consideration by the court in determining whether the debtor had an actual intent to hinder, delay or defraud one or more creditors.  Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation. * * * The fact that a transfer has been made to a relative or to an affiliated corporation has not been regarded as a badge of fraud sufficient to warrant avoidance when unaccompanied by any other evidence of fraud.  The courts have uniformly recognized, however, that a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged. * * *

one was a former officer; (3) Self Oil transferred all its assets to petitioner; and (4) the transfer occurred shortly after excise tax assessments were made and while Self Oil was disputing its liability for millions of dollars in excise fuel taxes and penalties. We also find telling that one of the creditors who directly benefited from the transaction was the transferor's sole owner, Mr. Self, Sr. Clearly, the Self family preferred to repay Self Oil's unsecured debt obligations to Mr. Self, Sr., to the disadvantage of Ohio's and Pennsylvania's coffers. During trial, Mr. Reiter testified as follows:

> Q: Did it give you any concern that Robert Sr. was being repaid in part for his loans?
>
> A: Yeah, it gave me some concern. You know, under the preference provisions of the corporate statutes there are-- you know, there are issues there regarding the payment of shareholders when there is other creditors. But he was a creditor.
>
> They had told me that--they had indicated all throughout that all the general creditors were going to be paid. He was another creditor. So you know, I think I talked about it. I'm not sure how strongly I talked about it or how much, but I do have a recollection that we did have a conversation with the accountant as well.

Additionally, petitioner continued in the same line of business from the same business premises (which were owned by and leased from Mr. Self, Sr.) as the transferor, Self Oil. Accordingly, respondent has persuaded us, given the facts and circumstances when taken together, that Self Oil had actual intent to "hinder,

delay or defraud" the State taxing authorities of Pennsylvania and Ohio.

<u>Defenses to a Finding of Fraudulent Transfer</u>

Despite a finding that a conveyance is fraudulent under PUFTA, relief is denied as against a transferee who can show that the transfer was made in "good faith" and for "reasonably equivalent value".  The exception provides in pertinent part:

> Sec. 5108.  Defenses, liability and protection of
>             transferee
>
> (a) Certain transfers or obligations not
> fraudulent.--A transfer or obligation is not fraudulent
> under section 5104(a)(1) (relating to transfers
> fraudulent as to present and future creditors) against
> a person who took in good faith and for a reasonably
> equivalent value or against any subsequent transferee
> or obligee.  [12 Pa. Cons. Stat. Ann. sec. 5108(a)
> (West 1999).]

"The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged."  12 Pa. Cons. Stat. Ann. sec. 5108, cmt. 1 (West 1999) (citing <u>Chorost v. Grand Rapids Factory Showrooms, Inc.</u>, 77 F. Supp. 276, 280 (D.N.J. 1948), affd. 172 F.2d 327, 329 (3d Cir. 1949)).

The committee comment to PUFTA section 5108 aids in defining the term "good faith":

> (6)  As used in this section, "good faith" means
> that the transferee or obligee acted without actual
> fraudulent intent and that the transferee or obligee
> did not collude with the debtor or otherwise actively
> participate in the fraudulent scheme of the debtor.  A
> transferee's or obligee's knowledge of a transferor's

insolvency, in and of itself, is insufficient to support a finding that the transferee or obligee lacked "good faith" as that term is used in this section. The transferee's or obligee's knowledge of the transferor's insolvency may, however, in combination with the transferee's or obligee's knowledge concerning other facts, be relied upon as evidencing a lack of "good faith" on the part of the transferee or obligee. [12 Pa. Cons. Stat. Ann. sec. 5108, cmt. 6.]

See also Tiab Communications Corp. v. Keymarket of NEPA, Inc., supra at 941.

Given the record, we do not believe that petitioner has acted in good faith with respect to the conveyance at issue. It is clear that Mr. Self, Jr., petitioner's agent and 50-percent owner, knew all the operative facts and circumstances underlying the transfer of Self Oil's assets. He was a former employee and officer of Self Oil and pleaded guilty to criminal charges that were based on factors that gave rise to the fuel excise tax assessments. He testified that he knew about the assessments, that Self Oil had appealed the assessments, that the criminal investigations caused Self Oil's line of credit to be frozen, and that the outlook for the future of Self Oil was "bleak". Mr. Self, Jr., testified that before the sale, he sought advice on how to acquire the business, he was in attendance at numerous meetings and participated in telephone conferences with his father and Self Oil's attorneys concerning appealing the assessments, and he "felt that the company was pretty much doomed." Nonetheless, the parties consummated a sale in which

the debt owed to the sole shareholder was preferred over the liabilities owed to the States of Pennsylvania and Ohio and respondent.

It is clear that petitioner through its agent, Mr. Self, Jr., had knowledge of all the operative facts and circumstances concerning Self Oil's dire situation and its scheme to transfer its assets before the commencement of collection activities. Accordingly, we hold that 12 Pa. Cons. Stat. Ann. section 5108 does not provide petitioner relief from liability as a transferee.[13]

We disagree with petitioner's self-serving argument that the sale as consummated "was a far better result than what would have occurred in a liquidation." Self Oil and petitioner did not have the right to pick and choose which creditors got paid. Among those creditors paid was Mr. Self, Sr., who received hundreds of thousands of dollars from petitioner. We agree with respondent that Self Oil and petitioner structured the transaction in such a way as to provide Mr. Self, Sr., with a preferential repayment status. Clearly, "Transactions between a debtor-corporation and

---

[13]Since 12 Pa. Cons. Stat. Ann. sec. 5108(a) (West 1999) is a conjunctive test, in light of our holding, we need not analyze or determine whether petitioner paid a "reasonably equivalent value" for the assets transferred. In Hagaman v. Commissioner, 100 T.C. 180, 184 (1993), we explained that inquiries into the adequacy of consideration "often are unnecessary because respondent will be permitted to prove a fraudulent transfer [under State law] by demonstrating actual intent to defraud."

its controlling officers must be scrutinized." In re Tri-State Paving, Inc., 32 Bankr. 2, 4 (Bankr. W.D. Pa. 1982) (citing Edward Hines W. Pine Co. v. First Natl. Bank, 61 F.2d 503 (7th Cir. 1932)). A shareholder/creditor may not use his special relationship with a corporation to the detriment of the corporation's other creditors. As the court explained in Tri-State Paving, Inc.:

> The Corporation owed money to the defendants, as it owed money to many other creditors. * * * Paying themselves in full by taking unfair advantage of their special positions and knowledge to save themselves from being prejudiced and simultaneously leaving their other creditors with nothing constituted an actual intent to defraud * * * [Id.]

In Robar Dev. Corp. v. Minutello, 408 A.2d 851, 853-854 (Pa. Super. Ct. 1979), the court stated:

> where officers of insolvent corporations satisfied the corporate obligations held by themselves prior to other creditors, equity has erected a presumption that such officers have taken unfair advantage of their special position and knowledge to save themselves from being prejudiced. The burden lies on the officers to show the circumstances which made it proper that they should be paid prior to the other creditors. [Citations omitted.]

See also Bernstein v. Donaldson (In re Insulfoams, Inc.), 184 Bankr. 694, 703-704 (Bankr. W.D. Pa. 1995) ("Directors of an insolvent corporation hold their powers 'in trust' for all creditors of the corporation. They may not use their powers for their own benefit and to the detriment of creditors."), affd. 104 F.3d 547 (3d Cir. 1997).

Petitioner argues that there was no such preference because "Every creditor with non-contingent claims were [sic] paid in full." Petitioner's argument fails because PUFTA makes no distinction between contingent and noncontingent liabilities. Specifically, PUFTA defines "claim" as "A right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 12 Pa. Cons. Stat. Ann. sec. 5101 (West 1999) (emphasis added); see id. sec. 5104, cmt. (6)(d); United States v. St. Mary, 334 F. Supp. 799, 803 (E.D. Pa. 1971) ("for the purpose of the law of fraudulent conveyances, a contingent liability has the same status as one which is fixed"); People's Sav. & Dime Bank & Trust Co. v. Scott, 154 A. 489 (Pa. 1931); Lafayette Manor, Inc. v. Carroll, 12 Pa. D.&C.3d 139, 145 (1979).

Petitioner further argues: "To successfully attack a transfer as fraudulent under the Act it is necessary that the creditors be prejudiced by the transfer, even where there is actual fraudulent intent." Petitioner cites no authority which interprets Pennsylvania's fraudulent conveyance law or PUFTA. In any event, the record does demonstrate that an unpaid creditor was harmed or prejudiced by the transfer. The record shows that Self Oil preferred the unsecured obligations owed to Mr. Self, Sr., rather than those owed to the contingent creditors. Mr.

Self, Sr., was repaid hundreds of thousands of dollars to the injury and prejudice of Pennsylvania, Ohio, and respondent.[14]

Conclusion

Respondent has borne his burden of proving that Self Oil fraudulently transferred its property in violation of PUFTA. Accordingly, we sustain respondent's determination.

Decision will be entered for respondent.

---

[14]There is no evidence that Pennsylvania's and Ohio's claims for fuel excise tax that Self Oil owed are superior to respondent's claim for unpaid income tax.